The next case is 24-1062, a Biomed v. Maquet Cardiovascular. Words I am probably massacring on both sides. Mr. Bradley, whenever you're ready. May it please the court. The district court erred in its construction of three claim terms. For the first two terms, the court relied on statements made by Maquet during the IPR process. The court found that there was, quote, Can I ask you about these two? Do you have to prevail on both of these to send it back? In other words, if we find that the district court erred in claim construction of one, but not on the other, is there still no infringement? So there's... No, I'm setting aside the means plus function, I get that. But we've got a purge fluid claim and an elongate lumen associated with the cannula. What happens if we split our decision on that? Does it go back, or do they still not infringe? It does go back, because they affect different claims. And the blue brief outlines... Are they not in all the different claims? That is correct, that they are not in all... Both terms are not in all the claims.  Just to be clear, if you prevail on any of your three arguments, at least some claims go back. That is correct, Your Honor. Yes, okay. And I do want to start with the elongate lumen associated with the cannula term. For this term, the term itself just says that the lumen is associated with the cannula. But relying on IPR statements made by McKay, the district court found a clear and unmistakable disclaimer and narrowed it to not just lumens associated with a cannula, but lumens formed along the side of a cannula, and that was wrong. The court should not have done that. In the red brief, Abiumed relies primarily on the specification. That was not the basis for the district court's ruling. The district court ruled that the portions of the specification relied on by Abiumed said they're preferred embodiments and do not explicitly define... We are free to, we can affirm based on the specification, even though the district court wasn't persuaded by the specification, correct? Correct, this is DeNova overview. I just wanted to point out that the district court did analyze this issue and found that the portions of the specification referred to by Abiumed are preferred embodiments and do not define the invention as a whole. That part was very correct and doesn't affect this claim scope. A portion of the district court construction of the elongate lumen term is this permanence requirement. You don't dispute that on appeal. I think the way the judge reached that portion of his construction was also prosecution history. Disclaimer. Do you take the position that he got that right or he got that wrong too? We take the position that we were trying to narrow the issues for presentation on appeal. We do have issues with it, but at the end of the day, for this case, theirs is permanent. It doesn't matter, and so the school has precedent saying that we resolve plain construction insofar as it matters for the case, and under that idea and the notion of trying to limit the number of terms for appellate consideration, we have not appealed that part. But the other part, the part where he narrowed associated with to mean formed along the side of the canula, that part was an error. There was no disclaimer during the IPR process. We were describing and refuting Abiumed's presentation of the prior art, and they relied on two references, one called Abelhausen, where there were side lumens in the canula. They combined that with one called Jaegeden that had a different place for the guide wire. Instead of it being in the side lumens for the canula, it was in a separate device, a guide catheter. And we told the board during the IPR process that Jaegeden provides a separate device, and so a skilled artisan would not combine these two together, because Jaegeden does this in a different way. And so there was no disclaimer. We said the part that the district relied on is where we said that Jaegeden teaches away from Abiumed's proposed modification, because Jaegeden teaches using a separate catheter instead of modifying the... How would one of skilled art reading that prosecution history understand that you didn't mean to even imply anything about your own claims, that you were only criticizing their prior art? Because the context of the discussion in our patent owner preliminary response was very clear that we were saying all along that their combination of Abelhausen and Jaegeden was incorrect. A person of skill in the art would not combine them. They teach different solutions to the same problem. And just because one of the prior art references talked about a guide wire and a side lumen, so when we refuted it, we talked about how you would not use that side lumen in this other reference. We weren't suddenly saying that the claims are now limited to side lumen embodiments. We were refuting the embodiment that they presented and saying why you wouldn't do it that way. And that was all there was to it. There was no clear and unmistakable disclaimer. A clear and unmistakable disclaimer is when you have a claim that says a blue widget, and they bring forth prior art that's a navy blue, and we say, no, no, we meant primary color blue. How about with respect to purge fluid, where you say, hey, it's a bad idea to do what this other prior art does. Doesn't that imply you're not doing that either? I understand the question. In the purge fluid context, the answer is no. It does not imply that, but that's also not quite what happened. When we said it's a bad idea, the thing that's a bad idea is putting metal bearing particles in the bloodstream. Of course, that's a bad idea. The key thing is how did you get there? They relied on this reference called Abelhausen, same one, and the claim term requires a lumen that delivers purge fluid into the pump. Abelhausen doesn't have a lumen, and so they needed to come up with some creative solution, and they found in figure 10, they said, well, we think we see a gap here between the rotor shaft and the bearings that go around it. We see a gap, and we'll say that's the lumen. You can run purge fluid through that, and as a result of that, we told the patent office, we said, they're nuts. There is no gap in Abelhausen. It wouldn't even work. If you have a gap between the rotor shaft and the bearings, it would be like attempting to rotate something with greased hands. It would not work. We made all these arguments, and we also explained that having their gap theory would, we said Abiumet's gap theory would require purge fluid to run directly between these bearings, meaning the gapped bearings between the rotor shaft and the bearings. So let's say, I'm gonna go back to the elongate lumen.  Let's say that we agree with you that this is not a clear and unmistakable disclaimer or something to that effect. What do you contend would be the right construction? The right construction of that one is the plain and ordinary meaning, which is what we submitted to the district court. Persons of skill in the art, in this context, reading the full intrinsic record, including the IPR, would know, and the experts could talk about respectively, what is and is not an elongate lumen associated with the cannula. Did you ever say what you thought that plain and ordinary meaning would be? And if you did, where did you say that in the record? We did not get that far in having to describe, and this judge does not particularly require parties to go further and say if it is plain and ordinary meaning, what is that plain and ordinary meaning? Certainly the specification gives many examples of lumens associated with the cannula. Part of our main point is there are many ways to have a lumen associated with the cannula that is not just the side lumen embodiment, and so the court's construction was wrong by narrowing it that way. And then you also relied on just plain and ordinary meaning for the purge fluid term? That's correct. And didn't also provide any explanation of what you thought that plain and ordinary meaning would be? That's true, yes. What do you think it is for the purge fluid? The construction, it requires a lumen, an actual lumen. A lumen is essentially like, if you think of a drinking straw, the space inside. So there needs to be some cavity in a structure, not just a gap in the middle of nowhere, a cavity with a structure, a lumen. Persons of skill in the art know what a lumen is, and the lumen needs to be able to deliver purge fluid to the intravascular blood pump. These are plain and ordinary terms to persons of skill in the art. Does that construction allow purge fluid to go through the ball bearings in your invention? It does. And what's the point of saying it would be bad for purge fluid to go through the ball bearings in the prior art we were discussing? It was not going through just the ball bearings, it was going through a gap between the ball bearings and the shaft, which doesn't work. Because if you have a shaft, and the ball bearings in the prior art, they're attached. They said they're not attached, there's a gap between them. And they would run purge fluid through there. But the problem I have is that why would you necessarily not get harmful materials in the blood stream from that device, the prior art device, but not yours when you're running it through the bearings? Because we explained in the IPR, and then I'll elaborate, we said that when the pump operates, under their theory, this gapped theory, when the pump operates, the bearings wear, releasing solid particles. What page are you reading from? That is from APPX 1230, which is the IPR statement we made. And then the district court quoted that in APPX 61. Actually, the district court quoted a paraphrase of it. The difference Judge Hughes is that in the gapped theory, when purge fluid is running between the shaft and the bearings, the shaft and the bearings are playing bumper cars. Because there's a gap there running fluid, and so they're hitting against each other, that could slough off bearing particles. When you're normally running purge fluid through bearings, they're just going through the bearings that are sealed, and it goes through, and then there's a seal at the end so it doesn't go into the bloodstream. The difference is, in Abelhausen, they concocted this gapped theory that didn't exist. And running fluid through a gap. I mean, they're allowed to create theories about prior art. It may be wrong, but they're allowed to do it. If we agree with you that it shouldn't have been narrowed to not going through the ball bearings, is there invalidity? I mean, the problem is they made this argument in an IPR, and you rejected it because, or the board rejected it, and one of the reasons you gave was the blood shouldn't go through the ball bearings. But now you're saying the blood can go through the ball bearings. That's a problem. No, I understand your question. The difference is. I mean, I don't understand why, if the board accepted your reasoning on Abelhausen, or however you say it, but now you're switching your, I know you're not gonna say you're switching your theory, but just go with me, I'm asking hypothetical gore, I'm asking, I'm not gonna hold you to it. Why that art wouldn't be invalidating if, in your patent, it's allowed to go through the bloodstream, or into the bloodstream. In their theory on Abelhausen, the purge fluid was going in between. Actually, let me ask you this question. If we take out all the statements in the IPR about it's bad for this to go through the ball bearings because it would get particles in the blood, do you think that our other arguments are insufficient, or are sufficient to distinguish your invention from the combination of the blue board? I don't, if I understand. Because the problem is, I don't think you should be allowed to rely on this bad particles in the bloodstream argument at the board, but not here. And so, if we disregard that, is Abelhausen invalidating or not? It's not, and there's no inconsistent positions between what we're saying, what we said in front of the board. Did the board say why it wasn't instituting on that ground? It wasn't because of any of these arguments. And the difference is, and I'll try to be clear about it. In the specification, it talks about purge fluid going through the bearings. And it is actually going through the bearings. And that is, because that's how it works. And that's how their accused product does it. That's how all of them do it. Can I just, let me see if I can get my layman and non-science view as it. Is your view that your invention, when it goes through the bearings, it's just a different structure and a different way of it going through the bearings. And you're trying to distinguish that structure from Abelhausen at the board. And so, it's not that it's bad overall for it to go through the bearings. It's bad for it to go through the bearings in the Abelhausen structure. That much is true. It is bad to go through the structure of Abelhausen where the bearings are supported in theory. What support is there for that notion? It's because in Abelhausen, and as we explained in the IPR, the bearings are separated from the shaft by their gap that they said exists. And when you run purge through it, through the gap, which is a totally different thing than what the specification describes, than what their accused product. And as we explained to the board, it doesn't work. I'm re-arranging my rebuttal. I've got a few questions, if you don't mind. In your specification, does the purge fluid, when it goes past the bearings, does it go into the bloodstream or does it not go into the bloodstream? It goes through the bearings and into the bloodstream. But not through a gap between the bearings and the rotor shaft, which is what their theory was and it makes no sense. On the means plus function term, they cite in the red brief of 52, this Diebold case, that they're not required to introduce extrinsic evidence that one of ordinary skill in the art would fail to understand that the term connotes definite structure. I didn't see you respond to that argument. Does somebody have to give us evidence as to whether one of skill in the art would know what this structure is? We cited the Dye Fan case. So the term is guide, I'll try to be brief, your honors. The term is guide mechanism, which is not in means plus function format, as the district court found that it is. It doesn't use the word means. So there's a rebuttal presumption that it's not in means plus function format. Under Dye Fan, this court said that the presumption can be overcome if a challenger, abument, demonstrates that the term fails to recite sufficient structure. We did not bear that burden. Even though we didn't bear it, we demonstrated how it was sufficient. And how do you square that with Diebold, where we said extrinsic evidence is not required by the challenger? They could present intrinsic evidence if it exists. Extrinsic evidence is not strictly required. The point is, it's their burden. They need some evidence. They need some evidence to overcome the presumption because as soon as it doesn't have the word means, we are in the lead. And this term does not, it is structural to a person of skill in the art. I'd like to reserve as much time as I have. Thank you, your honor. You have none, but we'll restore all three minutes of your rebuttal. May it please the court. Let me just start with the first question, Judge Hughes, you asked. I actually tallied up what would happen if you ruled in our favor on purge fluid, and there's no claims left of the five, not excluding the purge fluid. Mr. Bradley, can you take a look at it? I looked at it, too. If he wins on purge fluid, do you agree?  Yes, just so I can get it right. Yeah, can he? My colleague just corrected me that if we do not win on the purge fluid, the elongate women term doesn't need to be decided. The reverse is not true. Okay. Thank you. I was concerned, so I checked again while I was sitting. To start with the elongate women claim, it's really important to look at the actual language. Can we start with the purge fluid claim? Start with the purge fluid, sure, no problem. With the purge fluid, this is clearly a disclaimer. It's a disparagement of all systems. Here's my issue, and I think you heard what I asked, is it's very hard for me to understand, because it's kind of scant discussion, whether what their disclaimer is, is it's bad for the purge fluid to go through the specific structure in albulhasen in the way you said it would work, versus it's bad in general for the purge fluid to go through the barbicanes. The former, I think, is not a disclaimer. The latter is. Yeah, so let me address that. The way that they argued in their pauper, they had three separate arguments. One was, it doesn't work that way. Number two was, there's no gap, right? Which you can debate, you can look at it either way. I mean, you have to remember, these magnets are around the drive shaft, and there easily can be a groove through which liquid can go, and that's probably how it works. But that doesn't matter, because when they got to the third part, where they could have stopped, they could have just stopped and said, albulhasen doesn't teach this, right? The combination doesn't teach this, we're done, right? But as the district court found, they continued. And what they say is really important. They say, in addition, figure 10 shows bearings that engage with the rotor shaft. 1230? I'm at 1230, yes, sorry. Thank you. In addition, figure 10 shows bearings engage with the rotor shaft, right? So then they have the gap through, it would have to have the purge fluid go through. But then they make a broad statement. Running purge fluid through these bearings, and these are generic bearings, as we have in our brief, it shows that there's no difference between the bearings as they're depicted in albulhasen and the bearings as they're depicted in the patents that we shoot here. So it's through these bearings, you could say the bearings, you could say bearings, it's bearings, this is how these things operate. But you run fluid through the bearings and into the bloodstream, provides a mechanism to directly inject foreign bearing particles into the circulatory system. And then they say even more, e.g., when the pump operates, the bearings wear, that's going to happen for every pump, releasing solid particles. A posita would recognize that in here, this is again, not limited, opposed to a gap through. A posita would recognize that injecting floating particles from bearings into a patient's bloodstream is a bad idea, generically. And so there you go. In short, the design would not be compatible with a purge fluid line. But the important point here is that they're saying generically, you cannot run blood through purge fluid, through bearings and into the bloodstream. And in fact, that's the limit of the disclaimer here. It's possible for them to construct, under their claims, systems where the purge fluid does not go through the bearings and into the bloodstream. But where that happens, there's a disclaimer. And the court properly found there's a disclaimer. A person of skill in the art reading this would understand that they disparaged those type of systems and disclaimed them. This is pretty clear. Clearly and unmistakably, words of manifest exclusion, where is that? I don't, I mean, I understand where you're putting the emphasis. It's not an unreasonable reading, but it doesn't seem to me like it's the sole possible reasonable reading. In disclaimer cases, you always have a situation where people do not say, we hereby disclaim. This is really close. This is an unmistakable disclaimer. This is clear language. It says, a person of skill in the art would not do this. What about on appendix page 61, where the court is not sure what to make of the statement? No, this is something which has been made up. The court is faced with a conundrum. It's faced with a situation where the patents in suit. When you say something that's been made up, what do you mean? I mean, I just read you the sentence that is on page. The context in which this arises. Wait, hold on, sir. I need to ask the question, then you answer, then I ask, you answer, or they ask, okay? So let's just try to make the record clear. So it says, the court is not entirely sure what to make of the statement. May I go ahead and respond to that? Thank you, Your Honor. And I apologize for interrupting. The patent describes two different systems. One where the purge fluid goes through the bloodstream, through the pump and into the bloodstream, and another one where the pump goes through basically a recirculating line and goes out and onto the bloodstream. The court is discussing, right prior to that statement, the fact that the specification has these two systems. And so he says, faced with what he considers to be a clear and unmistakable disparagement of a system where the blood, where the purge fluid goes into the blood, he says, I'm not sure what to make of that because it's inconsistent. But of course, that's what you have when you have disclaimer. You have a situation where a patent possibly could be interpreted in one way. A patentee is confronted with prior art or some inconsistency, and the patentee says, I don't mean that. I don't mean to claim that. And so that's what the court gets. It's a direct contradiction. Wouldn't one of Wernicke on the art seeing a direct contradiction between the specification and one paragraph at the end with an end argument, a third of three, in addition, be at least a little bit confused like the district court was as to whether they really meant to disclaim all embodiments which are expressly disclosed in their specification where the purge fluid does in some way get into the bloodstream. I don't think a person of skill in the art would be confused because a person of skill in the art would understand that when confronted with a situation that their system would not operate in the real world, which is the argument that was made here by the patentee in support of its patent, would understand that although they had written a patent, a specification in a certain way, which happens all the time, and it turns out that the piece of prior art, there's some real reason in the real world why that doesn't work, they disclaim that part of it. The district court says, everyone faced with this direct contradiction, A63, the district court says, under the circumstances the narrower construction controls doesn't cite any authority for that. I don't know if you're defending that analysis or not. Is that correct? That when you have a direct contradiction between an arguably broader understanding in the patent itself, and what is later said contradictorily in IPR prosecution history, the narrower construction necessarily controls? I don't see this as necessarily a narrower construction. This is what the district court said. As an exclusion, that's the way he viewed the exclusion of this entire system. Are you defending that analysis? Yes. Okay, do we have authority? He doesn't cite any. I don't have anything right here. I mean, that only works if it actually is, meets the high standards for disclaimer. Otherwise, we just go with what's in the patent, right? That's true. There's no dispute that there's two different. I mean, I understand the issue here. I think it's very hard, because if they had said, in talking about Abolhassan, nobody would ever send this purge fluid through the bearings because it would get into the bloodstream, and our invention doesn't do that, that would be a clear disclaimer. It doesn't say that. It lops off the our invention doesn't do that, but it does seem to have the first part, and it doesn't seem to be limited in some ways to Abolhassan. I understand your point on that. Is that enough for disclaimer when it says nobody would ever do this, broadly, without adding on, and neither do we? I think it is. In the disparagement cases, and we cited a few of them in State Chicago Board of Trade, there was a criticism of the use of public outcry, trading floors, and a mix of public outcry and automated, and so the interpretation of the claim was that it was limited to an automated system. There was no statement that said we disclaim all those types of systems. It comes by an interpretation of the language, and here, what the person of skill in the art is gonna take away from this is you cannot put purge fluid through the ball bearings and into the bloodstream, and again, that's what the limitation of this disclaimer is here. And that's what we have to get from, what page is that again? Like 1200 something? 1230. 1230, from that one paragraph, which is, it's talking about Abolhassan, and the real question is do we read this, the statements as broadly disparaging for everything as you want us to, or do we read it as they want to, as broadly, or as disparaging only for this Abolhassan structure? How do we decide that? I think you have to look at it this way, because this doesn't actually relate to the gap theory, right? The gap doesn't matter here, because what they're talking about is the figure shows an actual structure, the structure being that the bearings engage with the rotor shaft, right? Which is also the teaching of what they have here. So the bearings engage with the rotor shaft, and we create particles that would go in the bloodstream. Sir, but what about on appendix page 1228, it sets it up where it says, petitioners misread the disclosure in Abolhassan, and then it has a subsection A, where it says petitioners manufacture a gap in figure 10, and then at the beginning of the paragraph in appendix page 1230, it talks more about petitioner's gap theory would require purge fluid to run directly between these bearings. So to say that this portion that you're pointing to as a disclaimer, doesn't relate to the gap theory, that seems mistaken in light of some of those portions that I just described. But the point here is that they're talking about the actual structure here, right? So they dispute that there's a gap, and they call this the gap theory. But here in this language, in the very first sentence, they're saying figure 10, that's Abolhassan, shows bearings engage with the rotor shaft, an actual structure. That's an actual structure, which is also used in other pumps. A person of skill in the art would understand that when you're going to rotate a rotor, you have to have bearings. You have to be able to do that, right? And so once you have that structure, it's that structure, not some gaps. What do the bearings engage with in their invention? The bearings? The bearings also engage on a rotor shaft, because in their invention, there's a drive shaft, external motor, and a drive shaft. The rotor blades have to be driven by something, and in that one, they're driven by a drive cable, but you have to have bearings around it to let it rotate. And so there's no dispute about that. There's a diagram in the, which I don't have at my fingertips, but there's a diagram in the specification which shows bearings with the same block diagram, we call them in purple, they're colored in purple in Abolhassan, with the same diagrams, the same schematics. They have the same structure. So do you think if we accept their, I'm not gonna have phrases, right, if we actually agree with the way they're viewing purge fluid being okay to go through the bearings that Abolhassan would have been invalidating, that the thing that was able to make their invention survive was this disclaimer? It's obviously in here for a reason. I can't tell you what the patent office would have done. Well, I'm not asking for what the patent office said. I was asking for your view. I think the, if this disclaimer wasn't here, would a combination of Abolhassan and whatever have been invalidating? I think it probably would be. Is that something that's still ripe to be litigated if we were to remand? I don't know if the establishments have come up yet. Okay, I don't know. Actually, Your Honor, don't know. Truly don't know the answer to that. I'd have to think about it. There are a lot of issues in this case, as you can tell. Can I ask you on the means plus function?  The presumption is that guide mechanism is not means plus function, which you have to rebut, and it's not clear to me what the district court saw that persuaded it that you rebutted the presumption. It doesn't seem to cite any evidence, intrinsic or extrinsic. So how is it that you think you succeeded in rebutting the presumption? Yeah, I mean, the means plus function claim analysis starts with the claim, and the claim is part of the intrinsic evidence. And here, I mean, the claim is this. This is the claim. And the entirety of the claim is an intravascular blood pump system comprising an intravascular blood pump having a cannula coupled thereto, a guide mechanism adapted to guide said intravascular blood pump, and a cannula, and then a pressure sensor. That's it. There's no structure whatsoever. Well, you say that, but neither, I mean, I don't mean to denigrate you. I'm not one of skill in the art, so I don't know how one of skill in the art would read that as having structure or not having structure. Okay. The other part of the extrinsic evidence here, obviously, is the specification. The specification does not contain the definition of guide mechanism. There's nothing in there that's described as a prior art guide mechanism, except a guide catheter, that separate catheter, the non-integrated. Remember, the invention here is a guide mechanism integrated into the device. They disparage, in fact, the guide catheter and distinguish it. So one of skill in the art is gonna have no idea what a guide mechanism means, because the only things in here that are described as guide mechanisms, these three aspects of the invention, are the invention. Here's my concern. The burden was on you. That has to be what rebuttable presumption means. And I think your answer is consistent with how the district court found rebuttal, is it only looked to the language of the claims. If the language of the claims are enough to rebut a presumption that's on you, then what does it mean to have a presumption on you? That means if nobody introduces any evidence, you still can win. There's, the evidence before him was the claim, the specification of the absence of any teaching of one of skill in the art, what a guide mechanism was. The failure to advance by McKay a definition of guide mechanism. If it was a known term in the art, there would be something, somewhere in a mechanical dictionary that said what guide mechanism was. There was nothing. That's enough. The, I forgot the name of the case that we cited. It's the... This is the one I referenced.  It was an ITC case. Diebold case? I mean, it says, none of our cases mandate that a party seeking to overcome the presumption against application of 112 can always do so by... If the claim is just nonce words. Is that? If the claim is just nonce words, a guide mechanism, but they didn't do anything beyond say it's a mechanism that guides, that's on its face means post-function. I mean, and we've looked to the specification to see what examples of mechanisms that guide are, and they get limited to that, which is what happened here, right? I agree. Mechanism is basically the same as means. There's no other structure here in the claim. And do you view that's enough to overcome a rebuttable presumption? It has to be, because otherwise what would this claim mean? This claim, you could avoid, that means you could avoid a means post-function claim just by avoiding the word means. And that can't be the case. And it can't be the case that you have to have... Well, I think that's why we took out the presumption going the other way too. Right, and it's not a heavy presumption. Right. So the result of this would be if... If the claim term had the word processor in it, we could look at that and say, even though it doesn't say a means to process, unless there's any indication that processor has some specific structural meaning, it's a nonce term and a means post-function claim. Right. And there's a difference between the mechanical arts also, where your case law does say that mechanical arts is a lot more difficult to find that it has structure if there's no structure in the claim. So I just want to circle back on one aspect, and then I will at least be done with my question. In terms of what I want to say, Judge Hughes kind of described to you in terms of the two different parts of a potential disclaimer. Do you remember you were having that discussion with him? The part that we actually see on page 1230 of the appendix versus the part that we don't see on page 1230 of the appendix saying that their invention works that way. Do you have like a best case you can point us to that the language that we see on page 1230 of the appendix is sufficient to be considered a disclaimer? If you wanted to point me to one case, what would you point me to? Sure, I would say two. One is the one the judge cited, which was SightSound Tech versus Apple. The other one is the Chicago Board of Options case, which I discussed. Okay, thank you. Thank you, Your Honor. Beyond your time, we ask you a lot of questions. Thanks. Thank you for your indulgence. I'd like to spend most of my time on the purge fluid, but quickly on the guide mechanism term. I explained a little bit and it's in our brief about why it's not in means plus function format. And I did wanna mention that if the court thinks it is in means plus function format, we still, the district court should have added clearly disclosed and linked structures that were omitted and the summary judgment of non-infringement should be vacated. As to the purge fluid term, I just wanna try to be a little clearer about what we're talking about. At APPX 817, there's an image that AVIMED presented to the Patent Trial and Appeal Board, and it shows their gap theory. And it is an important aspect of the arguments. What happened was they showed a gap between the bearings and the rotor shaft and ran purge fluid in that gap between the bearings and the rotor shaft. And when we were distinguishing this, we explained that there is no gap. The first sentence that he pointed to, we said, figure 10 of Abelhausen shows bearings engaged with rotor shaft. We said, that's what Abelhausen shows. It shows it together. There is no gap. So you don't think blood could, or purge fluid could flow through here at all? Correct, because there's no gap. It wouldn't work. That's what we explained to the PTAP. There's no gap between the shaft and the bearings. I get that, but then why did you go on and say, but even if it did, you would never have blood go through bearings because it would deposit stuff in the bloodstream. Because what we said, after explaining that in Abelhausen, the bearings, in fact, are connected to the shaft, there is no gap. We immediately said in the next sentence, this is at APPEX 1230, Abiumet's gap theory would require purge fluid to run directly between these bearings, meaning the gapped bearings, the ones that have a gap between the rotor shaft and the bearings. They ran the purge fluid in between the shaft and these bearings. Okay, I get that. And so you think that sentence, the running purge fluid is still confined to the gap theory specifically. And do you think that last sentence in the paragraph, that injecting floating particles from bearings into a patient's bloodstream is a bad idea, is also still confined to that theory? It is, because when you're running purge fluid. So I guess, I understand it, but does that mean that you can run purge fluid through ball bearings and not inject particles? And how do we know that? The thing we, if you want to say, we disclaimed the Abelhausen situation with a gap, it's okay with us. What you cannot do is run purge fluid between the bearings and the rotor shaft, because doing that, they're not connected. The rotor shaft is spinning. You're, this is, I think the number of the problem here is, you're saying running it through the Abelhausen design would be bad, but you could still run purge fluid through ball bearings in other circumstances. How do we know that from, particularly with this last sentence, which says a placebo would recognize that injecting floating particles from bearings into a patient's bloodstream is a bad idea. Does, is that based upon an assumption that not all purge fluid that goes through ball bearings injects particles, and how do we know that's true? That is true. The first part of it is true, that just passing purge fluid through ball bearings doesn't create ball bearing particles to go into the bloodstream. What would happen is, if you're putting purge fluid in a gap between the rotor shaft and the bearings, now they're, one of them's turning super fast. Can you point to a page of the appendix or something that supports that, what you're describing? It's, let's say PPX 1230. No, but it doesn't say that. It doesn't distinguish, it's very unclear, which may work in your favor, because disclaimer has to be clear, but that last sentence seems to be a very broad statement of don't put purge fluid through ball bearings, because it's a bad idea. The comment I would make, because I'm out of time, is that the lead-in and the discussion make clear that we're talking about this gap theory that they presented. Perhaps we disclaimed that gap theory, we probably did, but it doesn't matter, because it's not a real, it would never present itself in real life, and I would piggyback on Judge Hughes and earlier Judge Stark's comment that, maybe Judge Kenningham as well, that the court here said it's not entirely sure what to make of this statement. And I think- Can I just ask you real quick? You emphasized these bearings, as opposed to the bearings. Your friend on the other side suggested there was no dispute that the bearings you were talking about here in the prior art are the same bearings as in your patent. Is that disputed, or is it not? It is disputed, because these bearings are referring to the gapped bearings. Can we see in the record somewhere that there's a dispute on that point? The actual ball bearings are probably the same, but in Abelhausen, in their theory, there was a gap between the bearings and the shaft. So it's the same bearings, but they're in a different structure. Is that the bottom line? It's a different structure, because it was, the theory they presented was one where there was a gap, and it would be running it through those gapped bearings. That's the difference. It's not true for all bearings. Thank you. Thank you, Your Honors. Case is submitted.